**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

| | | |
|---|---|---|
| **VINCENT GREGORY BAISI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Civil Action No. 3:24-00162** |
| | ) | |
| **CPL. JOHN BLEAVINS, *et al.,*** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PROPOSED FINDINGS AND RECOMMENDATION**

Pending before the Court are the following: (1) Plaintiff's Motion for Summary Judgment (Document 108), filed on May 27, 2025; and (2) Defendant Bleavins' Motion for Summary Judgment (Document No. 115), filed on June 6, 2025.

**PROCEDURAL BACKGROUND**

On March 29, 2024, Plaintiff, acting *pro se,*[1] filed his Motion to Proceed Without Prepayment of Fees and Complaint claiming entitlement to relief pursuant to Title 42 U.S.C. § 1983. (Document Nos. 1 and 2.) In his Complaint, Plaintiff named the following as Defendants: (1) Cpl. John Bleavins; (2) Lt. Lloyd Erwin;[2] (3) Western Regional Jail ("WRJ"); (4) Counselor Jo Moore;[3] and (5) Carl Aldridge. (Document No. 2.) Plaintiff claimed that the above Defendants

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

[2] By Order entered on August 12, 2024, the Court substituted Lt. Lloyd Erwin in place of Lt. James Irwin after being notified by counsel of the mistaken identification. (Document No. 49.)

[3] Defense counsel indicated that Plaintiff included an incorrect spelling concerning the first name of Defendant Moore. (Document Nos. 45 and 46.) Defense counsel indicated that Defendant Moore's first name is "Jo" instead of "Joe." Thus, the Clerk was directed to substitute "Counselor Jo Moore" in the place of "Counselor Joe Moore." (Document No. 71, p. 2, fn. 3.)

have violated his constitutional rights under the First, Fourth, and Fourteenth Amendments. (<u>Id.</u>, p. 5.) First, Plaintiff asserted a claim against Lt. Erwin. (<u>Id.</u>, pp. 4 – 5.) Plaintiff alleged that approximately one week after he requested a grievance form, Lt. Erwin came to Plaintiff's cell inquiring as to why Plaintiff needed the grievance form. (<u>Id.</u>, p. 4.) Plaintiff acknowledged that he informed Lt. Erwin that Plaintiff had requested the grievance form because he was being denied a religious food tray "pertaining to [his] religious diet." (<u>Id.</u>) Plaintiff alleged that "Cpl. Bleavins as well as Inmates Willie Dial and William Hatfield were present." (<u>Id.</u>) Plaintiff asserted that after having a conversation as to why Plaintiff needed the religious food tray, Lt. Erwin allegedly stated that Plaintiff was "a f*cking pussy for worshipping [Plaintiff's] God" and Plaintiff and his "people should be thankful for him and his people and if it wasn't for them, [Plaintiff] wouldn't be allowed to worship [Plaintiff's] God anyways and [Plaintiff] was lucky [his] 'kind' (referring to [Plaintiff] being native) wasn't forced to live on reservations." (<u>Id.</u>, pp. 4 – 5.)

Second, Plaintiff asserted a claim against Counselor Jo Moore. (<u>Id.</u>, pp. 5 – 6.) In support, Plaintiff stated that he ordered "religious texts such as the Minokhired, Book of Enoch, Book of Mithra, and more over the month of December and January." (<u>Id.</u>, p. 5.) Plaintiff stated that all of the foregoing texts were from the approved vender. (<u>Id.</u>) Plaintiff explained that he was instructed to turn in his "religious texts of Epistle of Barnabas, Understanding Zoroastrianism and Persian Fables and Mythology, so that [Plaintiff] could receive [his] other texts." (<u>Id.</u>) Plaintiff complained that he turned in the religious texts, but he was not given his "other books." (<u>Id.</u>, p. 6.) Plaintiff indicated that he filed a grievance and the "response said [Plaintiff] never turned in [his] books which were already confiscated." (<u>Id.</u>) Plaintiff explained that he "then cited case law in the 2nd grievance showing how [Plaintiff] was supposed to receive [his] books." (<u>Id.</u>) Plaintiff stated that in response, he was advised that he "was given all books sent to the facility." (<u>Id.</u>) Plaintiff asserted

2

this "is a lie and can easily be proven with order of receipt." (<u>Id.</u>) Plaintiff concluded that "Counselor Jo Moore is responsible." (<u>Id.</u>)

Third, Plaintiff alleged a claim against Cpl. Bleavins. (<u>Id.</u>) In early February, Plaintiff claimed that while he was in segregation, Cpl. Bleavins saw Plaintiff reading the Dead Sea Scroll text and told Plaintiff he had always wanted to read it. (<u>Id.</u>) Plaintiff alleged that Cpl. Bleavins "asked if he could borrow it to read during his shift." (<u>Id.</u>) Plaintiff stated that he handed the book to Cpl. Bleavins, but Cpl. Bleavins never returned the book to Plaintiff. (<u>Id.</u>) Plaintiff claimed that Inmates Marcus Saunders and Jack Queener were witnesses to him handing the book to Cpl. Bleavins. (<u>Id.</u>) Plaintiff stated he filed a grievance to Jo Moore and Superintendent Aldridge, and he received "several different responses." (<u>Id.</u>) Plaintiff complained that one response stated, "You may take Cpl. Bleavins to Court, but we as a facility will not do anything about it." (<u>Id.</u>)

Fourth, Plaintiff complained he was denied access to the law library during the time period he was in segregation. (<u>Id.</u>) Plaintiff explained he was in segregation from December 24, 2023, until February 27, 2024. (<u>Id.</u>) Plaintiff stated that he "made multiple attempts per request to go the law library in dealing with my legal matters and was largely denied even after filling out grievances." (<u>Id.</u>) Plaintiff stated that he "made approximately 30 written requests and was maybe called four or five time to the law library." (<u>Id.</u>)

Fifth, Plaintiff asserted he was denied his mail while in segregation. (<u>Id.</u>, p. 7.) In support, Plaintiff stated that on February 24, 2024, he "received mail while in segregation to the tablet via ViaPath." (<u>Id.</u>, p. 7.) Plaintiff, however, complained that he "was never told [he] got this mail." (<u>Id.</u>) Plaintiff asserted that when he got out of segregation on February 27, 2024, he signed in to the tablet where it showed he had mail. (<u>Id.</u>) Plaintiff claimed that the mail would not load, and it said the "file is corrupt, please print." (<u>Id.</u>) Plaintiff stated he "made multiple requests and this

place denied me my mail and won't print it off." (Id.) Plaintiff argued that "per policy, [Plaintiff] was supposed to receive a paper copy of [his] mail on 2-24 when [he] was in segregation." (Id.) Plaintiff concluded "now it will not load . . . and the only way to get it is for them to print it." (Id.)

Sixth, Plaintiff complained that he ordered a prayer mat in January through the appropriate vender and "it was rejected." (Id.) Plaintiff claimed that "upon filing a grievance, this facility acknowledged [Plaintiff's] need for one but then refused to allow [Plaintiff] to order and receive one." (Id.)

Seventh, Plaintiff stated that "[w]e as inmates are told our religious texts are on the tablet so we don't need to request the Chaplain for the texts." (Id.) Plaintiff complained he is "Zoroastrian and the Avesta is not on there." (Id.) Plaintiff further claimed that he "can only sign on the tablet during certain times, so [Plaintiff] can only read & study God during certain times." (Id.) Plaintiff asserted that "[u]pon filing grievances, Superintendent Aldridge said he was unconcerned about the ability of people to read religious texts 24/7 and he's not responsible for 'catering' to people with religion." (Id., pp. 7 – 8.)

Finally, Plaintiff alleged Cpl. Bleavins provided Plaintiff with a religious tray with a dead mouse on it on February 15, 2024. (Id., p. 8.) Plaintiff claimed this occurred "after all the other incidences dealing with the religious problems." (Id.) Plaintiff asserted the delivery of the religious tray containing the dead mouse was "seen on camera at 5:47 a.m." (Id.) As relief, Plaintiff requested "the court to award a minimum of $250,000." (Id., p. 5.)

By Order entered on April 18, 2024, United States Magistrate Judge Cheryl A. Eifert[4]

---

[4] Due to the retirement of Judge Eifert, the above matter was referred to Magistrate Judge Joseph K. Reeder on September 3, 2024, for total pretrial management and submission of proposed findings of facts and recommendation for disposition. (Document No. 55.) By Order entered on September 4, 2024, the above matter was transferred to the undersigned for total pretrial management and submission of proposed findings of facts and recommendation for disposition. (Document No. 58.)

granted Plaintiff's Motion to Proceed Without Prepayment of Fees and Costs. (Document No. 4.) Although Judge Eifert granted Plaintiff's Application to Proceed Without Prepayment of Fees and Costs, Judge Eifert determined Plaintiff had the ability to pay an initial partial payment of the filing fee and directed that Plaintiff pay such by May 15, 2024. (Id.) The Clerk was directed to issue process promptly upon receipt of Plaintiff's initial partial payment of the filing fee. (Id.) Plaintiff paid his initial partial payment of the filing fee on April 30, 2024, and the Clerk's Office issued process on the same day. (Document Nos. 5 and 6.)

On May 29, 2024, Defendants Aldridge and WRJ filed a Motion to Dismiss and Memorandum in Support. (Document Nos. 12 and 13.) Defendants Aldridge and WRJ argued that Plaintiff's claims should be dismissed based on the following: (1) WRJ "must be dismissed because it is not a legal entity" (Document No. 13, pp. 5 – 6); and (2) "Plaintiff has failed to state a claim upon which relief can be granted against Defendant Aldridge" (Id., pp. 6 – 10). Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff on May 30, 2024, advising him of the right to file a response to the Defendants Aldridge and WRJ's Motion to Dismiss. (Document No. 14.) On June 10, 2024, Plaintiff filed his Response in Opposition. (Document No. 16.) On June 25, 2024, Plaintiff filed his "Memorandum in Response to Carl Aldridge's Motion to Dismiss" (Document No. 20) and Exhibits (Document Nos. 20-1 – 20-18). On June 25, 2024, Plaintiff filed a "Motion to Include Defendant." (Document No. 21.) Specifically, Plaintiff stated that he wishes to include Commissioner Betsy Jividen as a defendant. (Id.)

On August 9, 2024, Defendant Moore filed a Motion to Dismiss and Memorandum in Support. (Document Nos. 45 and 46.) Defendant Moore argued that Plaintiff's claims against her should be dismissed because Plaintiff has failed to allege sufficient facts to show that his rights

under the Free Exercise Clause or the Religious Land Use and Institutionalized Persons Act ("RLUIPA") were violated by the series of events for which he claims Defendant Moore was responsible. (Document No. 46.) Also on August 9, 2024, Defendant Erwin filed his Motion to Dismiss and Memorandum in Support. (Document Nos. 47 and 48.) Defendant Erwin argued that Plaintiff's claims should be dismissed based on the following: (1) Plaintiff's Complaint must be dismissed as to this Defendant because Plaintiff's allegations are "insufficient to state a claim for violations of the Free Exercise Clause or RLUIPA under the applicable federal pleading standard" (Document No. 48, pp. 4 – 6); and (2) Plaintiff's claim that this Defendant violated his equal protection rights by making disparaging remarks regarding his alleged race and religion is insufficient to state an equal protection violation. Notice pursuant to Roseboro was issued to Plaintiff on August 12, 2024, advising him of the right to file a response to the Defendants Moore and Erwin's Motions to Dismiss. (Document No. 49.)

On August 16, 2024, Plaintiff filed his "Memorandum in Response to Jo Moore's Motion to Dismiss." (Document No. 52.) On August 23, 2024, Defendant Moore filed her Reply. (Document No. 53.) Without obtaining leave of the Court, Plaintiff filed his Surreply to Defendant Moore's Reply on September 3, 2024. (Document No. 56.) Also on September 3, 2024, Plaintiff filed his "Amended Civil Complaint." (Document No. 57.) In his "Amended Civil Complaint," Plaintiff stated the following supplemental allegations against Defendant Moore:

> Comes now the Plaintiff, pro se, to amend the Complaint to offer further clarification into the actions of negligence. The Complaint filed originally and still stands with the Amendment being made to clarify actions of negligence done. Ms. Moore denied my mail, a grievance was filed because she simply stated to me, she was not giving me my mail. She stated in the reply of the grievance that she was not giving me my mail even though it was made known that mail was extremely pertinent and if not received I would not only have a constitutional right violated but I would lose the ability to retain the book contract and I would lose my home. This was being done while not knowing I did not receive mail informing me my mother-in-law passed away by my life partner because I did not respond to that

letter and was not "emotionally supportive," she left me because she was alienated from affection. She made actions to purposely deny my mail, my religious books, which is a law of God in my faith is to spend a third of the night studying his word and in growth of him that denial of action causes me to sin and therefore not practice my religion in the official and righteous capacity. Ms. Moore also is responsible for handling the grievance procedure, so therefore, when a grievance is made, she is supposed to handle the grievance and rectify the situation. Therefore, for all the reasons listed in the original Complaint, Ms. Moore is personally responsible not only for her actions, but in some cases, her failure to act and allowing negligence in areas she is supposed to act. Inaction of her duty lead to the act of my constitutional violations. This amendment does nothing to alter the original Complaint, [but] simply to clarify the actions of a defendant listed herein. The amount of action done by Ms. Moore are substantial, have all been grievance, over 40 infractions of constitutional violations that indeed meet the qualification for relief in a 1983 civil suit. These actions involve denying mail, legal calls, legal library, religious material needed to practice my religion according to the law of God, religious materials as well as failing to fix other grievances done by others, that when the grievance is filed it now becomes her duty. Therefore, the Plaintiff asks this amendment to the civil Complaint be allowed to offer further clarification of Ms. Moore's responsibility for the Complaint alleged.

(Id.) On September 17, 2024, Defendants filed a "Motion to Strike Amended Complaint Filed Without Leave of the Court." (Document No. 61.)

By Proposed Findings and Recommendations ("PF&R") entered on November 25, 2024, the undersigned recommended that the District Court grant Defendant Aldridge and the WRJ's Motion to Dismiss for Failure to State a Claim (Document No. 12); deny Plaintiff's Motion to Include Defendant (Document No. 21); deny Defendants' Motion to Strike Plaintiff's Amended Complaint (Document No. 61); grant Defendant Moore's Motion to Dismiss With Prejudice (Document No. 45); grant Defendant Erwin's Motion to Dismiss With Prejudice (Document No. 47); and refer the matter back to the undersigned for further proceedings concerning Defendant Bleavins. (Document No. 71.) On December 9, 2024, Plaintiff filed Objections. (Document No. 72.) By Memorandum Opinion and Order entered on March 31, 2025, United States District Judge Robert C. Chambers adopted the undersigned's recommendation, granted Defendant Aldridge and the WRJ's Motion to Dismiss for Failure to State a Claim (Document No. 12), denied Plaintiff's

7

Motion to Include Defendant (Document No. 21), denied Defendants' Motion to Strike Plaintiff's Amended Complaint (Document No. 61), granted Defendant Moore's Motion to Dismiss With Prejudice (Document No. 45), granted Defendant Erwin's Motion to Dismiss With Prejudice (Document No. 47), and referred the matter back to the undersigned for further proceedings concerning Defendant Bleavins. (Document No. 89.)

On May 9, 2025, Plaintiff filed a "Notice of New Evidence, Witness Testimony." (Document No. 106.) Plaintiff claims that "Inmate Joshua Hatten was the trustee that worked in segregation assisting Officer Bleavins when serving trays. He can testify to Cpl. Bleavins taking the mouse off the trap in Pod A, Section 5, and placing it in my religious tray as retaliatory act because I filed grievances about him taking my book and losing it."[5] (Id.) On May 20, 2025, Defendant Bleavins filed a "Response to Plaintiff's Notice of New Evidence, Witness Testimony and Motion to Strike Inmate Joshua Hatten as a Witness." (Document No. 107.) Defendant Bleavins argues that it is proper for this Court to strike Inmate Hatton as a witness pursuant to Rule 37(c)(1) of the Federal Rules of Civil Procedure. (Id.) As an Exhibit, Defendant Bleavins attached a copy of the following: (1) A copy of Plaintiff's "Response to Defendant's Combined Discovery Request" (Document No. 107-1); and (2) A copy of Plaintiff's Deposition (Document No. 107-2). Plaintiff filed his Reply on June 2, 2025. (Document No. 111.) By separate Order entered this day, the undersigned has denied Defendant Bleavins' Motion to Strike Inmate Hatten as a Witness.

On May 27, 2025, Plaintiff filed a Motion for Summary Judgment and Memorandum in Support. (Document Nos. 108 and 109.) As an Exhibit, Plaintiff filed the "Affidavit of Joshua Douglas Hatten." (Document No. 110-1.) On June 4, 2025, Defendant Bleavins filed his Response

---

[5] Inmate Hatten's Affidavit is void of any facts indicating that Inmate Hatten witnessed Defendant Bleavins remove a dead mouse from a trap in Pod A, Section 5, or that Inmate Hatten observed Defendant Bleavins place a dead mouse in Plaintiff's food tray.

in Opposition. (Document No. 114.) As Exhibits, Defendant Bleavins filed the following: (1) A copy of pertinent pages from the Deposition of Plaintiff (Document No. 114-1); and (2) A copy of the Deposition of Inmate Jack Queener (Document No. 114-2.) Plaintiff filed his Reply on June 16, 2025. (Document No. 119.)

On June 6, 2025, Defendant Bleavins filed his Motion for Summary Judgment and Memorandum in Support. (Document No. 115 – 116.) Specifically, Defendant Bleavins argues that he is entitled to summary judgment based on the following: (1) "Defendant Bleavins is entitled to qualified immunity with regard to claims related to Plaintiff's religious book" (Document No. 116, pp. 6 – 7); and (2) "Cpl. Bleavins is entitled to qualified immunity with regard to claims related to the mouse allegedly being found in Plaintiff's tray" (Id., pp. 7 – 8). As Exhibits, Defendant Bleavins filed the following: (1) A copy of pertinent pages from the Deposition of Plaintiff (Document No. 115-1); and (2) A copy of the Deposition of Inmate Queener (Document No. 115-2.) Notice pursuant to Roseboro was issued to Plaintiff on June 9, 2025, advising him of the right to file a response to the Defendant Bleavins' Motion for Summary Judgment. (Document No. 117.) On June 18, 2025, Plaintiff filed a "Motion to Contest Deposition Transcript." (Document No. 120.) On July 7, 2025, Plaintiff filed his Response in Opposition to Defendant Bleavins' Motion for Summary Judgment. (Document No. 123.)

## SUMMARY OF EVIDENCE

### A.    Plaintiff's Deposition:

During his Deposition, Plaintiff explained that Defendant Bleavins borrowed a religious text from Plaintiff and never returned it. (Document No. 107-2, p. 6.) Plaintiff states that in early February 2024, Defendant Bleavins observed Plaintiff "reading the Dead Sea Scroll text and told me he has always wanted to read it and asked if he could borrow it." (Id.) Specifically, Plaintiff

explains as follows:

> [Defendant Bleavins] walked through, asked me what I was reading and then I showed him. And that's when he said he's always wanted to read it. He's heard about it. He's into those type of things. And then asked if he could read it if he brought it back before his shift because he works nights. So I'm like, yeah, here, because I had my other texts so I gave him that.

(Id.) Plaintiff verified that his claim was that Defendant Bleavins borrowed a religious text that he never returned to Plaintiff. (Id., pp. 6 – 7.) In addition to the claim that Defendant Bleavins borrowed a religious text on one occasion that was never returned, Plaintiff stated that Defendant Bleavins also served Plaintiff a religious food tray that contained a dead mouse on February 15, 2024. (Id., pp. 9 and 13.) Plaintiff explained as follows:

> . . . I don't say that it's him. I did not say - - want I say is he was the CO when I got handed my religious tray. I do believe that he - - okay, I do not believe whatsoever that Mr. Bleavins was the one that put a mouse in my religious tray. I'm not saying that. He just happened to be the unlucky CO that handed me the crappy tray.

(Id., p. 9. )[6] Plaintiff goes on the explain that he believed the dead mouse was placed in his food tray by an inmate working in the kitchen who either thought it was funny or was upset by having to prepare a religious tray. (Id., pp. 13 – 14.) Plaintiff stated that he did not think Defendant Bleavins had anything to do with the mouse being placed in his food tray, but Defendant Bleavins was "supposed to check my tray and open it and go through it before it comes to my bean hole." (Id., p. 15.)

**B.    Plaintiff's Affidavit:**

---

[6] In his Motion to Contest Deposition Transcript, Plaintiff explains that he contests the accuracy of the transcript concerning the foregoing statement. (Document No. 120, p. 2.) Plaintiff alleges that he believes he answered as follows:

> [I] would like to believe that Mr. Bleavins did not have anything to do with the mouse in the tray and he happened to be the officer who handed me a crappy tray, but that doesn't mean it's true. I would like to not believe whatsoever he had had anything to do with that, but I'm not saying that.

(Document No. 120, p. 2.) A review of the entire transcript, however, reveals that Plaintiff stated that he did not believe that Defendant Bleavins placed the dead mouse in his food tray. (Document No. 107-2, pp. 13 - 14.) The foregoing Motion is currently pending before the Court. The Court is currently awaiting a Response from defense counsel.

In his Affidavit, Plaintiff stated that Defendant Bleavins borrowed "my Dead Sea Scrolls text and never returned my property, and later denied to me and the facility he ever took it." (Document No. 123-3.) Plaintiff asserted that he "filed grievance on Cpl. Bleavins for the incident and later he served me a religious tray with a dead mouse in it." (Id.) Plaintiff states that he "firmly believes Cpl. Bleavins placed that mouse in my tray as a retaliatory act when I filed the grievance on him for stealing my property." (Id.)

## C.    Deposition of Inmate Jack Queener:

During his deposition, Inmate Queener stated that he and Plaintiff shared a cell in the segregation unit for a "couple of months" at the Western Regional Jail. (Document No. 115-2, p. 2.) Inmate Queener explained his knowledge of the mouse in Plaintiff's food tray as follows:

> We got our trays through the little hole in the door that morning. I had both our cups. I was getting us come juice from the CO that was there. I don't recall his name very well. I can't remember, but there was a trustee with him also. [Plaintiff] got a special religious tray and it came in the Styrofoam. I got the normal tray so you could see everything on mine. His was closed. When we got our trays in there he grabbed ours and as I was getting that juice [Plaintiff], he started - - I mean, of course, he was upset and started, you know, making a sick noise because there was a mouse in the cereal on this tray. And the mouse looked like it was - - it looked like it was dead for a day or two. . . . That's when he seen it - - seen the dead mouse in there and he gave it back to the CO out there. Really, there was no action taken about it by the jail. The jail pretty much just ignored it.

(Id.) Inmate Queen, however, stated that he had no knowledge of how the mouse got in Plaintiff's food tray. (Id., p. 3.) Inmate Queener indicated that he believed Defendant Bleavins was "supposed to inspect the tray" before giving the tray to an inmate, but Defendant Bleavins gave Plaintiff his "trays multiple mornings and he never checked anything in [Plaintiff's] trays." (Id., p. 4.) Inmate Queener further explained that Plaintiff's religious tray came in a Styrofoam container with a lid that was closed. (Id.) Inmate Queener stated that he had no reason to believe that Defendant Bleavins put the mouse in Plaintiff's food tray. (Id., p. 3.) Inmate Queener stated that he had no

issues with Defendant Bleavins, and was unaware of any issues between Plaintiff and Defendant Bleavins. (Id.) Inmate Queener verified that Defendant Bleavins asked to borrow a religious book from Plaintiff, which Defendant Bleavins never returned. (Id.) Inmate Queener stated that Defendant Bleavins told Plaintiff that he wanted to read the book, and Plaintiff loaned the book to Defendant Bleavins to read. (Id.) Inmate Queener, however, explained that he was "asleep when [Plaintiff] gave [the book] to [Defendant Bleavins]." (Id.) Inmate Queener further stated that he did not know Defendant Bleavins' motive in not returning the book. (Id.) On crossed examination, Inmate Queener explained that Defendant Bleavins was "enraged about the book." (Id., p. 4.) Inmate Queener, however, stated that he did not know if Defendant Bleavins was just "annoyed of asking where [Plaintiff's] book was so many times or if he just didn't want to say anything so he could keep it." (Id.)

**D.    Inmate Joshua Douglas Hatten's Affidavit:**

In his Affidavit, Inmate Hatten stated he worked as a segregation trustee from January 2024 until February 2024. (Document No. 110-1, p. 1.) Inmate Hatten acknowledged that he "was not initially present when the trays were brought into A-Pod." (Id., p. 2.) Inmate Hatten explained that "it was not until after [the trays] were in Pod A, Section 5, that I was brought out to assist serving trays in segregation the morning the incident occurred where [Plaintiff] was served a mouse on his religious tray in February, 2024." (Id.) Inmate Hatten asserted that he remembered Plaintiff "having a special religious tray that came in a Styrofoam container." (Id.) Inmate Hatten stated that he recalled Defendant Bleavins "telling me to 'watch' as the tray was being served through the door to [Plaintiff] prior to him discovering there was a dead mouse in his religious tray." (Id.) During "tray-up," Inmate Hatten explained that he stated "how that must suck to receive that tray [and] Cpl. Bleavins response was 'he is what he eats.'" (Id.) Inmate Hatten stated that he was

aware that Plaintiff had previously filed a grievance against Cpl. Bleavins for borrowing a religious book that was never returned to Plaintiff. (Id.) Inmate Hatten asserted that "when the core officer brought a new tray for [Plaintiff], he said he checked the trays before sending them down the hall." (Id.) Inmate Hatten stated that he "never witnessed Cpl. Bleavins check the tray while I was helping serve." (Id.) Inmate Hatten asserted "it is my firm belief that Cpl. Bleavins either had foreknowledge of it being in the tray, or placed it in the tray [himself] from the mouse trap under the stairs in Pod A, Section 5, as a retaliatory act before I was brought out of my cell to help assist with breakfast." (Id.)

## THE STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-moving movant." Wai Man Tom v. Hospitality Ventures LLC, 980 F.3d 1027, 1037 (4th Cir. 2020)(citations omitted.); also see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(A "material fact" is a fact that could affect the outcome of the case); CTB, Inc. v. Hog Slat, Inc., 954 F.3d 647, 658 *4th Cir. 2020)("A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict of the nonmoving party."); FDIC v. Cashion, 720 F.3d 169, 180 (4th Cir. 2013)(A "genuine issue" of material fact exists when the evidence is sufficient to allow a reasonable jury to return a verdict in the non-moving party's favor). "The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact." Wai Man Tom, 980 F.3d

at 1037. The moving party may satisfy this burden by showing that the non-moving party has failed to prove an essential element of the non-moving party's case that the non-moving party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim.). Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. See Celotex Corp., 477 U.S. at 325, 106 S.Ct. 2548; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986); also see Wai Man Tom, 980 F.3d at 1037(citation omitted)("[T]o survive the motion for summary judgment, [the non-moving party] may not rest on the allegations averred in his pleadings. Rather, the nonmoving party must demonstrate specific, material facts exist that give rise to a genuine issue.") Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson, 477 U.S. at 247-48, 106 S.Ct. 2505("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); Perry v. Kappos, 2012 WL 2130908, * 3 (4th Cir. 2012)(quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)("At the summary judgment stage, the non-moving party must come forward with more than 'mere speculation or the building of one inference upon another' to resist dismissal of the action.") All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356; also see Sedar v. Reston Town Center Property, LLC, 988 F.3d 756, 763 (4th Cir. 2021)("The requirement to construe the facts, and all

reasonable inferences therefrom, in the light most favorable to the non-moving party does not require [the court] to accept cherry-picked snippets of the testimony divorced from their context."). Additionally, the court is not allowed to make credibility determinations or weigh the evidence at the summary judgment stage. Stanton v. Elliott, 25 F.4th 227, 234 (4th Cir. 2022)(noting that the disbelief in a non-moving party's ability to succeed on the merits is insufficient to grant summary judgment). If no facts or inferences which can be drawn from the circumstances will support Plaintiff's claims, summary judgment is appropriate. See Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993)(Summary judgment is proper where it is apparent from the record that "no reasonable jury could find for the nonmoving party.")

## ANALYSIS

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." Turner v. Safley, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Title 42 U.S.C. § 1983 provides a remedy for violations of all "rights, privileges, or immunities secured by the Constitution and laws [of the United States]." Thus, Section 1983 provides a "broad remedy for violations of federally protected civil rights." Monell v. Dep't of Social Services, 436 U.S. 658, 685, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Generally speaking, to state and prevail upon a claim under 42 U.SC. § 1983, a Plaintiff must prove that (1) a person acting under color of State law (2) committed an act which deprived him of an alleged right, privilege or immunity protected by the Constitution or laws of the United States.

1.    **Loss of Personal Property:**

In Plaintiff's Motion for Summary Judgment, Plaintiff argues he is entitled to summary judgment because the evidence supports a finding that Defendant Bleavins asked to borrow Plaintiff's religious book (Dead Sea Scroll) and never returned it. (Document No. 108 and

15

Document No. 109, p. 1.) Plaintiff argues that borrowing something and never returning it is "the definition of stealing." (Id.)

In Response, Defendant Bleavins argues that Plaintiff is not entitled to summary judgment because "there are certainly no facts to lead a jury to find that Cpl. Bleavins has violated the Plaintiff's federally protected civil rights by failing to return the subject book." (Document No. 114, pp. 1 – 2.) Defendant Bleavins argues that during Plaintiff's deposition, Plaintiff confirmed that his claim was simply that Defendant Bleavins had taken the book with Plaintiff's permission, and failed to return it. (Id., p. 1.) Defendant Bleavins acknowledges that Inmate Queener confirmed during his deposition that Plaintiff loaned the book to Defendant Bleavins and Defendant Bleavins failed to return the book. (Id., p. 2.) Defendant Bleavins further notes that Inmate Queener acknowledges he was asleep when the book was loaned to Defendant Bleavins and Inmate Queener did not know Defendant Bleavins' motive in not returning the book. (Id.) Defendant Bleavins argues that based upon the evidence and testimony, at most he "was negligent in failing to keep track and return the subject book." (Id.) Defendant Bleavins asserts there are not facts to lead a jury to find that he violated Plaintiff's constitutional rights in failing to return the book. (Id.)

In Reply, Plaintiff argues that Defendant Bleavins "does not dispute the fact that Cpl. Bleavins asked to borrow the book and never returned it." (Document No. 119, p. 1.) Plaintiff states that Defendant Bleavins "shows supporting evidence confirming he asked to borrow the book and never returned it." (Id.) Plaintiff contends that Defendant Bleavins merely "argues that it isn't considered stealing the Plaintiff's property." (Id.) Plaintiff claims there is no way Defendant Bleavins "can cover up the fact that [he] never returned the property, it doesn't matter the reason, that is theft."[7] (Id., p. 2.) Plaintiff asserts that "[i]f someone asked to borrow someone's car and

_____

[7] Throughout Plaintiff's filings, Plaintiff argues that the facts establish that Defendant Bleavins stole Plaintiff's book

never brought it back, it would be considered by the law as theft/grand larceny." (Id.)

In Defendant Bleavins' Motion for Summary Judgment, Defendant Bleavins argues that Plaintiff's claim related to the alleged loaning of a religious book should be dismissed. (Document No. 115 and Document No. 116, pp. 6 – 7.) Defendant Bleavins first argues that "Plaintiff's allegation that [he] failed to return or keep track of a book loaned to him by the Plaintiff is essentially a claim of simply negligence." (Document No. 116, p. 6.) Second, Defendant Bleavins argues that Plaintiff has failed to establish that he violated Plaintiff's Fourteenth Amendment rights. (Id.) Finally, Defendant Bleavins contends he would be entitled to qualified immunity even if this Court found that he did violate Plaintiff's Fourteenth Amendment rights. (Id., pp. 6 – 7.)

In Response, Plaintiff continues to argue that the evidence supports a finding that Defendant Bleavins stole his religious book. (Document Nos. 123, pp. 1 – 2.) Plaintiff asserts that Defendant Bleavins "did indeed take the personal property of [Plaintiff]." (Id., p. 5.)

To the extent Plaintiff is attempting to allege a due process claim under the Fourteenth Amendment, the undersigned finds that Plaintiff has failed to state a plausible claim. The undersigned notes that the undisputed record indicates that Plaintiff's loaned a book (Dead Sea Scroll) to Defendant Bleavins, but Defendant Bleavins never returned the book to Plaintiff. To assert a plausible due process claim, however, a plaintiff must show that his deprivation was not

---

or committed theft. It is well established that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). Thus, Plaintiff has no right to initiate criminal proceedings against Defendant Bleavins. *Young v. Herald*, 2005 WL 1048117, * 8 (E.D.Ky.)(stating that the authority to initiate criminal complaints rests exclusively with state and federal prosecutors); *Kennedy v. Anderson*, 373 F.Supp 1345, 1346 (E.D.Okl. 1974)(stating that any charge brought under 18 U.S.C. § 242 "may only be initiated by a federal grand jury or a United States Attorney"); and *Dixon v. State of Maryland*, 261 F. Supp. 746 (D.Md. 1966)(Prisoner could not institute criminal proceedings against a State or its officers for violation of his rights under the color of law). Furthermore, the Court does not have the authority to direct that an individual be prosecuted. *See United States v. Batchelder*, 442 U.S. 114, 124, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979)(stating that the decision whether to prosecute and what charges to file rest in the prosecutor's discretion); *Inmates of Attica Correctional Facility v. Rockefeller*, 447 F.2d 375 (2nd Cir. 1973)(finding that the authority to investigate and initiate criminal complaints rest exclusively with the United States Attorney).

"amenable to 'rectification by . . . post-deprivation state remedies.'" Mora v. The City of Gaithersburg, MD, 519 F.3d 216, 231 (4th Cir. 2008); also see Hudson v. Palmer, 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)("[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post-deprivation remedy for the loss is available.") A plaintiff's ability to file a state claim for conversion constitutes a meaningful post-deprivation remedy.[8] See Kidd v. Bradley, 578 F.Supp. 275, 276-77 (N.D.W.Va. 1984)(recognizing that under the common law of West Virginia, the plaintiff had a cause of action for conversion and the negligent deprivation of property, which provided plaintiff an adequate post-deprivation remedy); also see Goodman v. Ramey, 2012 WL 5966642, * 4 (S.D.W.Va. Nov. 29, 2012)(J. Copenhaver)(finding that plaintiff failed to state a constitutional claim for the loss of property where he could have challenged the taking "in a garden-variety tort claim in state court."). Additionally, West Virginia Code §§ 14-2-1, et seq., permits monetary recovery for lost or damaged personal property by filing a claim against state agencies with the Legislative Claims Commission. Woody v. West Virginia Division of Corrections, 2022 WL 3571912, * 6 (N.D.W.Va. July 12, 2022)(recognizing W. Va. Code §§ 14-2-1 et seq. as an adequate post-deprivation remedy). Plaintiff has the ability to assert a conversion claim in State court concerning the alleged taking of his personal property, the undersigned finds that Plaintiff has failed to state a plausible due process claim. Id.(finding plaintiff failed to state a plausible claim where "Plaintiff has not demonstrated that he attempted to take advantage of any of these processes under state law and therefore he has not established that there is an absence of state processes under which he

---

[8] To the extent Plaintiff wishes to pursue a conversion claim, Plaintiff should initiate a civil action in the State Court of the location where the alleged conversion occurred.

could attempt to recover for the loss of his property") In the instant case, there is no indication that Plaintiff has filed civil action for conversion wherein Plaintiff seeks relief for such. Of importance, the undersigned notes that there is no allegation or indication that existing State remedies are inadequate. The mere fact Plaintiff *may* be unsuccessful in his State case, does not establish that Plaintiff's property was taken without due process. Accordingly, the undersigned respectfully recommends that the District Court dismiss Plaintiff's due process claim under the Fourteenth Amendment for failure to state a plausible claim, and deny as moot Plaintiff and Defendant Bleavins' Motions for Summary Judgment (Document Nos. 108 and 115) as to the above claim.

**2.    Retaliation:**

In Plaintiff's Motion for Summary Judgment, Plaintiff argues he is entitled to summary judgment because the evidence supports a finding that Defendant Bleavins placed a dead mouse in Plaintiff's food tray as an act of retaliation for Plaintiff filing a grievance. (Document No. 108 and Document No. 109, pp. 1 - 2.) Plaintiff states that the evidence supports a finding that Plaintiff filed a grievance based upon Defendant Bleavins' failure to return Plaintiff's religious book (Dead Sea Scroll). (Id., p. 1.) Plaintiff claims that after Plaintiff "filed grievances on the matter, at a latter dated Mr. Bleavins then served [Plaintiff] a religious diet tray with a dead mouse in it." (Id., pp. 1 – 2.) Thus, Plaintiff concludes that "all evidence points that Mr. Bleavins put the mouse in the tray as a retaliatory act against [Plaintiff] for filing grievance against him for stealing his property." (Id., p. 2.) Plaintiff argues that it is the policy of Aramark to inspect religious trays before the trays leave the kitchen to ensure the religious trays are prepared correctly.[9] (Id., p. 3.) Plaintiff further

---

[9] The undersigned notes there is no evidence in the record confirming the existence of such policies, or sworn statements by pertinent individuals verifying that such policies were followed on the date of the incident with the dead mouse. Finally, there is no evidence in the record supporting a finding that there was a mouse trap located in Pod A, Section 5, that contained a dead mouse on the date of the incident.

asserts that it is D.C.R. policy that food trays be "inspected before being sent down the hall." (Id.) Thus, Plaintiff concludes that if his food tray was properly inspected pursuant to Aramark and D.C.R. policies, Defendant Bleavins had to be the individual to put the dead mouse in his food tray. (Id., pp. 3 – 4.) Plaintiff concludes that Defendant Bleavins would have had access to Plaintiff's food tray and there was a mouse trap under the steps in Pod A, Section 5. (Id., pp. 4 - 5.) Plaintiff notes that Inmate Hatten was the trustee assisting Defendant Bleavins with food service and Defendant Bleavins instructed Inmate Hatten to "watch" as Plaintiff's food tray was delivered. (Id., p. 5.) Plaintiff further contends that Defendant Bleavins stated to Inmate Hatten that Plaintiff "is what he eats." (Id.) Plaintiff claims the foregoing indicates that Defendant Bleavins considered Plaintiff to be a rat or snitch. (Id.) Plaintiff concludes that "ALL evidence, testimonies, reports, etc. conclude that [the dead mouse] had to be placed by Officer Bleavins as a retaliatory act for [Plaintiff] seeking accountability for this same officer stealing his property."[10] (Id., p. 6.)

In Response, Defendant Bleavins argues that Plaintiff is not entitled to summary judgment because there is no evidence supporting a finding that Defendant Bleavins placed the dead mouse in Plaintiff's food tray. (Document No. 114, pp. 2 – 3.) Defendant Bleavins contends that Plaintiff's

---

[10] In his Motion for Summary Judgment, Plaintiff appears to allege that he has established an Eighth Amendment violation concerning his food tray containing a mouse. (Document No. 108, p. 1.)("Based on the evidence presented in the memorandum, the Plaintiff feels enough evidence has been presented to prove cruel and unusual punishment.") First, the undersigned finds that Plaintiff failed to assert an Eighth Amendment violation in his Complaint and has filed no motion to amend concerning such. Second, Plaintiff's allegation that that his food tray contained a mouse on one occasion is insufficient to establish an Eighth Amendment violation. *See Phillips v. LaValley*, 2014 WL 1202693, at *12 (N.D.N.Y. Mar. 24, 2014) (finding that an inmates' food tray being "contaminated" with a cockroach poses a condition that is "insufficiently serious to sustain an Eighth Amendment conditions of confinement claim"); *Mitchell v. Goord*, 2007 WL 189087, at *5 (N.D.N.Y. Jan. 22, 2007)(holding that allegations of, inter alia, an "infestation by vermin, insects, rats, and mice" does not rise to the level of an Eighth Amendment violation); *Govan v. Campbell*, 289 F. Supp. 2d 289, 296–97 (N.D.N.Y. 2003)(permitting, inter alia, "wild birds ... to fly within the cells ... do[es] not rise to the level of a constitutional violation"); *Miles v. Konvalenka*, 791 F.Supp. 212, 214 (N.D.Ill. 1992)(allegations of finding a dead mouse in a food tray was insufficient to plead deliberate indifference on the part of the defendants). To the extent Plaintiff is alleging an Eighth Amendment violation, Plaintiff's claim should be dismissed.

own testimony makes it "crystal clear that Plaintiff did not see who placed the mouse in this tray and does not believe Bleavins placed the mouse in his tray." (Id.) Defendant Bleavins further notes that Inmate Queener had no firsthand knowledge as to how the mouse got in Plaintiff's food tray. (Id.) Defendant Bleavins argues that "[a]t this stage of the litigation, with discovery closed, the Plaintiff has produced no evidence that proves, or tends to prove, that Cpl. Bleavins placed the mouse inside Plaintiff's tray or that Cpl. Bleavins was aware that a mouse had allegedly been placed in Plaintiff's tray." (Id.) Defendant Bleavins acknowledges that after the close of discovery, Plaintiff submitted the Affidavit of Inmate Hatten. (Id., pp. 3 – 4.) Defendant Bleavins argues that in the Affidavit, "Inmate Hatten does not allege to have seen Cpl. Bleavins allegedly remove the mouse from a trap or place the mouse on the subject tray." (Id.) Defendant Bleavins contends that "Inmate Hatten attest that he never saw Cpl. Bleavins open the tray." (Id.) Defendant Bleavins argues that "this affidavit is nothing more than speculation of Inmate Hatten or, more likely, a document prepared by Inmate Baisi and endorsed by Inmate Hatten." (Id.) Accordingly, Defendant Bleavins requests that Plaintiff's Motion for Summary Judgment be denied. (Id.)

In Reply, Plaintiff argues that the delay in disclosing Inmate Hatten as a witness was the result of Superintendent Aldridge delaying responses to Plaintiff's discovery requests. (Document No. 119, pp. 2 – 3.) Next, Plaintiff argues that defense counsel asserts that "Inmate Hatten's Affidavit is speculation, but in the same breath quotes [Plaintiff's] deposition where it is speculated that Cpl. Bleavins wasn't responsible for the mouse in the tray." (Id., pp. 3 – 4.) Plaintiff contends that "[a]fter further investigation and the study of policy and the following of simple logic, it is easy to conclude that Cpl. Bleavins placed that mouse in the tray as a retaliatory act" if the following occurred: (1) "If policy and the Aramark staff say that religious trays are checked to make sure they are properly prepared and portioned;" (2) "Lt. Casteel confirms Styrofoam trays

are checked at the core before going down the hall to the pods;" (3) "There being a mouse trap in the pod Cpl. Bleavins works, and the comments made prior to serving the tray, as well as the isolated time he had by himself with the trays;" and (4) "Lt. Erwin's report that it smelled terribly and would have been detected before going down the hall by smell alone." (Id., pp. 4 – 5.) Plaintiff concludes that a "[f]inal investigation and logic both support and prove beyond a reasonable doubt that was a retaliatory act, and a judgment for relief is entitled to the Plaintiff." (Id., p. 5.)

In his Motion for Summary Judgment, Defendant Bleavins argues that Plaintiff's retaliation claim related to Defendant Bleavins serving Plaintiff a food tray containing a dead mouse should be dismissed. (Document No. 115 and Document No. 116, pp. 6 – 7.) Specifically, Defendant Bleavins repeats the arguments he asserted in opposition to Plaintiff's Motion for Summary Judgment. (Id., pp. 2 – 3.) Defendant Bleavins again argues that "Plaintiff has produced no evidence that proves, or tends to prove, that Cpl. Bleavins placed the mouse inside Plaintiff's tray or that Cpl. Bleavins was aware that a mouse had allegedly been placed in Plaintiff's tray." (Id., pp. 3 and 7.) Defendant Bleavins contends that "the evidence and testimony in the record tends to prove that Cpl. Bleavins passed a close tray to the Plaintiff with no knowledge that it contained a dead mouse." (Id., p. 7.) Defendant Bleavins argues that Plaintiff admitted during his deposition that he believed Defendant Bleavins "just happened to be the unlucky CO that handed him the tray." (Id.) Defendant Bleavins asserts that "Plaintiff's claim is essentially that Cpl. Bleavins had some duty to open a sealed[11] tray and inspect it prior to delivering the Plaintiff's tray." (Id.) Defendant Bleavins, however, argues that "Plaintiff cannot identify any authority that

---

[11] Defense counsel's representation that Plaintiff's religious food tray was "sealed" is misleading. During Inmate Queener's Deposition, Inmate Queener clearly testified that Plaintiff's food tray was not "sealed" in any fashion, such as "shrink-wrapped." (Document No. 115-2, p. 2.) Inmate Queener explained that Plaintiff's food was served in a clamshell Styrofoam container with a closed lid. (Id.) There is no evidence in the record contradicting the foregoing or indicating that Plaintiff's religious food tray was "sealed" in some fashion.

would have placed Cpl. Bleavins on notice that he may be violating the Plaintiff's constitutional right by not checking his sealed tray prior to handing the same to the Plaintiff." (Id., p. 8.) Thus, Defendant Bleavins argues he "is entitled to qualified immunity with regard to claims related to the mouse allegedly being found in Plaintiff's tray." (Id., pp. 7 – 8.)

In Response, Plaintiff argues that facts are clearly in dispute concerning the dead mouse placed in his food tray. (Document Nos. 123, pp. 2 – 3.) Plaintiff asserts that "[a]t the time of deposition [Plaintiff] wanted to be under the opinion of Cpl. Bleavins having nothing to do with the incident." (Id., p. 3.) Plaintiff contends that "further investigation shows the religious tray was checked by the Aramark worker before leaving the kitchen, Lt. Scott Casteel reported verbally . . . that he checked all Styrofoam trays before leaving the core to go to the sections, so factual testimony says the tray was normal and cleared to be served prior to being in the possession of Cpl. Bleavins."[12] (Id.) Plaintiff states that "testimony by Mr. Queener proves [Plaintiff] was served a tray with a mouse in it as well as Lt. Erwin's report." (Id., pp. 3 – 4.) Plaintiff asserts that Inmate Hatten's Affidavit indicates that Defendant Bleavins was "hinting and speaking on placing the mouse in the tray as a retaliatory act for [Plaintiff] filing grievance against him for stealing his property." (Id.) Plaintiff states that the foregoing creates issues of fact. (Id., p. 4.) Finally, Plaintiff argues that Defendant Bleavins' act of placing a dead mouse in his food tray "is not in any way protected under qualified immunity." (Id., pp. 4 – 5.) Therefore, Plaintiff requests that Defendant Bleavins' Motion for Summary Judgment be denied. (Id., p. 5.)

To state a retaliation claim under Section 1983, a plaintiff must allege "(1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and

---

[12] Again, Plaintiff offers no evidence to support this statement.

the defendant's conduct." Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017). As to the first element, it appears undisputed that Plaintiff filed grievances concerning Defendant Bleavins' alleged failure to return Plaintiff's religious book. See Martin, 858 F.3d at 249("Prisoners retain the constitutional right to petition the government for the redress of grievances."); Hoye v. Gilmore, 691 Fed.Appx. 764, 765 (4th Cir. 2017)("[P]risoners have a constitutional right to file prison grievance free from retaliation."). Specifically, it appears undisputed that Plaintiff filed the relevant grievances on January 27, 2024 (Document No. 20-7), February 17, 2024 (Document No. 20-8), February 20, 2024 (Document No. 20-9).

As to the second element, such is met when "the defendant's alleged retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Martin, 858 F.3d at 249. A plaintiff's "actual response to the retaliatory conduct is not dispositive of the question of whether such action would likely deter a person of ordinary firmness. Id. In the instant case, the record indicates that Defendant Bleavins served Plaintiff a food tray containing a dead mouse on February 15, 2025. The undersigned finds that the adverse action of a correctional officer contaminating an inmate's food tray with a dead animal, such as a mouse, could deter an inmate of "ordinary firmness" from exercising his or her First Amendment right to pursue a prisoner grievance. There, however, are issues of material fact concerning whether Defendant Bleavins was responsible for the placement of the dead mouse in Plaintiff's food tray. Sworn statements by Plaintiff, Inmate Queener, and Inmate Hatten indicate that a dead mouse was found in Plaintiff's food tray. Plaintiff and Inmate Queener, however, state that they have no firsthand knowledge concerning who was responsible for the placement of the dead mouse in Plaintiff's food tray. Inmate Hatten states that while assisting Defendant Bleavins with the serving of the food trays, Defendant Bleavins told Inmate Hatten to "watch" as Defendant Bleavins delivered the

contaminated food tray to Plaintiff. Inmate Hatten further asserts that Defendant Bleavins later stated the following in reference to Plaintiff receiving the contaminated food tray: "He is what he eats." Viewing the evidence in the light most favorable to Plaintiff, there is a genuine dispute of material fact regarding whether Defendant Bleavins was aware and/or responsible for the placement of the dead mouse in Plaintiff's food tray.

As to the third element, the casual relationship between Plaintiff's protected activity and Defendant Bleavins' conduct, Plaintiff argues that Defendant Bleavins placed the dead mouse in Plaintiff's food tray in response to Plaintiff filing a grievance against Defendant Bleavins. The record indicates that Plaintiff filed a grievance on January 27, 2024 concerning Defendant Bleavins' failure to return a religious book, and Defendant Bleavins served Plaintiff a food tray containing a dead mouse on February 15, 2024. See Roscoe v. Kiser, 2019 WL 6270240, at * 2 (W.D.Va. Nov. 22, 2019)("Courts can infer causation when the adverse action occurs shortly after a plaintiff engaged in a protected activity.") Since a reasonable juror could find Defendant Bleavins is responsible for the placement of a dead mouse in Plaintiff's food tray and that Defendant Bleavins' motivation for such was in retaliation for Plaintiff filing a grievance against Defendant Bleavins, summary judgment is improper.

Finally, the undersigned will consider Defendant Bleavins' argument that Plaintiff's above claim is barred by the doctrine of qualified immunity. Courts have established qualified immunity for government officials in consideration of a number of factors including the substantial cost of litigation against government officials, the distraction of government officials from their public responsibilities and the disincentive to responsible and capable persons to accept government positions if there is no protection against suits accusing them of misconduct in the performance of their public duties. Government officials performing discretionary functions are generally

protected from civil damages liability if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). In determining the validity of a qualified immunity defense, the Court should be guided by a two-prong test: (1) whether the facts viewed in the light most favorable to the Plaintiff establish a deprivation of an actual constitutional right; and (2) whether that right was clearly established at the time of the purported violation. Id. The sequence of the steps is immaterial following Pearson. The Court may exercise discretion in deciding which of the two prongs "should be addressed first in light of the circumstances in the particular case at hand." Id. at 818. "A constitutional right is 'clearly established' when its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." Cooper v. Sheehan, 735 F.3d 153, 158 *4th Cir. 2013)(internal quotation marks and citations omitted).

In the instant case, Defendant Bleavins is not entitled to qualified immunity because Plaintiff alleges a clearly established right concerning his claim of retaliation under the First Amendment. In 2017, the Fourth Circuit held that an inmate's right to file a prison grievance free from retaliation was clearly established under the First Amendment so as to preclude qualified immunity. Booker v. South Carolina Dept. of Corrections, 855 F.3d 533, 546 (4th Cir. 2017); also see Martin, 977 F.3d at 298(finding defendant was not entitled to qualified immunity regarding plaintiff's "retaliation claim because, under this Court's precedent, it was clearly established at the time [defendant] placed [plaintiff] in segregation that retaliating against an inmate for filing a grievance violated the inmate's rights under the First Amendment"). Additionally, as stated above, there are genuine issues of material fact concerning whether Defendant Bleavins violated

26

Plaintiff's clearly established right to be free from retaliation based upon Plaintiff's filing of grievances.

Based upon the foregoing, the undersigned respectfully recommends that Plaintiff's Motion for Summary Judgment (Document No. 108) be denied and Defendant Bleavins' Motion for Summary Judgment (Document No. 115) be denied.

## PROPOSAL AND RECOMMENDATION

Based upon the foregoing, it is therefore respectfully **PROPOSED** that the District Court confirm and accept the foregoing factual findings and legal conclusions and **RECOMMENDED** that the District Court **DISMISS** Plaintiff's due process claim under the Fourteenth Amendment for failure to state a plausible claim, **DENY** Plaintiff's Motion for Summary Judgment (Document No. 108), and **DENY** Defendant Bleavins' Motion for Summary Judgment (Document No. 115).

The Plaintiff is hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Robert C. Chambers. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen (14) days (filing of objections) and three (3) days (if received by mail) from the date of filing of this Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d

91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Chambers and this Magistrate Judge.

The Clerk is requested to send a copy of this Proposed Findings and Recommendation to Plaintiff, who is acting *pro se*, and transmit a copy to counsel of record.

Date: October 16, 2025.



Omar J. Aboulhosn
United States Magistrate Judge